Kidder, J.
This action was brought by the plaintiff to recover damages claimed to have been sustained by him while being thrown out of a freight car of the defendant by its servants.
*270 There was a trial by jury and a verdict for the plaintiff. A motion for a new trial was made and overruled, and a judgment entered for the plaintiff, from which this appeal was taken.
The assignments of error were these:
1- The ruling of the Court by which counsel was permitted to cross-examine Fields, as to whether he was not then under indictment for injuring the plaintiff, and for the crime of maiming.
2. That part of the charge of the Court, which is in the following language: “The defendant’s agent is bound to use due care “ and prudence in expelling passengers from its cars; and although “ the plaintiff was a trespasser at the time of the accident, and was “ wrongfully on the cars at the time, the defendant would be “ liable for damages arising from the wanton and malicious act “ of its servants while they are executing what they supposed to “ be the order of the company, even though the order did not in “ fact contemplate such acts.”
3. The denial by the Court of defendant’s motion for a new trial, based among other things, upon the ground that the evidence did not justify the verdict.
The conclusion at which we have arrived renders it unnecessary in determining this case to consider only one of the assignments of error (the 3d.) Does the evidence justify the verdict?
It appears from the certificate of the Judge who tried the case below that all the evidence adduced on the trial was brought up in the record.
The plaintiff, James Finney, testified as follows: * * * * I'went into the box car and I took my coat off and my hat, and laid it on the corner of the car — box car — the west end of the car; laid my coat down and rolled it up and put it under my head, and took my shoes off. I rolled my coat up and put it under my head in the car. It was a very warm day; got in to have a little sleep *271 and a little rest; was tired; I put my coat under my head and took my shoes off; and 1 was in there about two hours, and I seen two men come in the car; [ didn’t see them; I was asleep at the time; they came in and gave me a kick in the feet and wakened me up; I recognized one of them as having light chin whiskers, and a light straw hat on. He says to me, “ Git out of this car;” I says, uAll right, sir; just as soon as I put my shoes on.” I asked him if I could put my shoes on, and he studied awhile. While he was studying that way I got one shoe on my foot; just as I got one shoe on he grabbed me around the legs and dragged me on my back.
Q. How far?
A. Over to the car door; there.I was getting up on my knees. Just as I got up on my knees — just about the time I got straightened in front of him — I got a poke of the iron bar in my eye.
Q. You say just about the time you got straightened up you got a poke of the iron bar in your, eye?
A. Yes, sir; just about the time I got straightened up — wasn’t hardly straightened up at the time I got the poke — well, at the time I got the poke I got shoved out of the car; with his left hand he shoved me out of the car, and I fell down on the ground on my back.
Q. What did he do (Fields) then, after that?
A. He jumped out on the other side of the car. There was another man with this one; two of them came in the car; they jumped out on the other side of the car, and they shoved me out on the other; they shoved me out on the south side, and they jumped out on the north side and ran away.
Q. You say you recognized one of these men in there as having chin whiskers and a mustache?
A. He had a mustache and light chin whiskers down here. He had a straw hat on.
*272 Q. State if you knew at the time what his name was?
A. I heard some of the boys talking about him before this happened.
Q. Have you since learned what the name of the man was that you identified at that time?
A. Yes, sir.
Q. What was his name?
A. Dick Fields, or Richard Fields, rather.
Q. Do you know whether he was in charge of the company’s cars and property there?
A. Yes, sir.
Q. What did you do after you got knocked down on to the ground ?
A. I laid there about half an hour until I regained my senses. I didn’t know just what the nature of the thing was. I thought my eye Was knocked out, so I told a gentleman who was going by if he wouldn’t go in the car and throw out my coat and one shoe. He got in the car and threw out one shoe for me and my coat and my hat. I sat there about ten minutes, I should judge, then I regained my senses, and I started up for the city here. Came up ■to Dr. Darrow’s office and Dr. Darrow wasn’t in at the time; he was away. I laid down outside.
Q. Laid down outside, where?
A. Outside of the bank building, over there.
Q. Of what bank?
A. The First National Bank, I believe. I laid down there a little while, and somebody went for Dr. Darrow. Dr. Darrow came round and examined my eye, and sent me to the county hospital here in Fargo.
Q. Now state if you lost that eye from the result of that accident?
A. I did, sir.
*273 Q. From the result of that blow?
A. From the result of that blow. * * *.
Q. When Mr. Fields ordered you out of the car did you try to get out as soon as you could?
A. Yes, sir. I told him I would just as soon as I put my shoes on, and he wouldn’t give me time to put one shoe on.
Q. You told him you w >uld as soon as you could get your your shoes on?
A. -Yes, sir. I told him I would just as soon as I could put my shoes on. He wouldn’t give me time to put my shoes on; grabbed me by the legs and dragged me over to the car door; only had time to put one shoe on.
Q. Did you make any resistance — refuse to leave the car?
A. No, sir. Not anything, whatever.
Q. Was you going out just as rapidly as you could?
A. Yes, sir. Just as fast as I could I was going out of the car.
Q. State if from the result of that blow you have lost your eye?
A. Yes, sir. I have lost my eye for my natural days, I suppose. My eye is gone.
Oross-exarmnation: Q. — What time of day was it you went into that car, Mr. Finney?
A. I should think, sir, that it was about half-past ten.
Q. About half-past ten?
A. About ten o’clock or half-past ten in the forenoon — in the daytime.
Q. What time was it they came into the car and woke you up?
A. I should judge, sir, it was about half-past twelve or one o’clock. •
Q. You went into that car to take a sleep, you say?
A. Yes, sir.
*274 Q. Had you had a sleep the night before?
A. No, sir. I didn’t sleep much the night before.
Q. Where were you?
A. I was around Fargo.
*****
Q. Had you no regular boarding place, then ?
A. No, sir. x * * * -»
Q. Had you no regular room anywhere to sleep?
A. No, sir. I hadn’t been here long. * * *•
Q. Had you stopped at the same place any two nights?
A. I stopped there at the Bramble House, I think it was, one night.
Q. Which night — the first night you came?
A. I think so; yes, sir.
Q. Where did you stop the next night?
A. No, sir; I made a mistake. The first night I didn’t sleep any at all.
Q. Where were you?
A. I was going round Fargo and Morehead.
-x- -x- -x- •* -x-
Q. Had you been drinking pretty freely that night, also?
A. Yes, sir. Was drinking a little before I went into the car. Q. Pretty much intoxicated, were you not, when you went into the car?
A. Well, not so very bad. It was more from the loss of sleep than anything else, x * * -x- -x-
Q. Do you say there was two men came into the car together?
A. Yes, sir; two men.
Q. Who was the other man besides Mr, Fields. Do you know?
A. I couldn’t distinctly see him at the time. I know there was two men came into the car.
*275 Q. Did they come in after you was awake?
A. No, sir. They came in before I was waked up.
Q. When you woke up you saw them both in the car?
A. Yes, sir. They came up and waked me up.
Q. You say that you had your eye injured by a bar in the hands of Mr. Fields. Did you see that har in his hands?
A. No, sir. I didn’t see anything. I don’t know what it was that I was struck with.
Q. Did you see anything in his hands when you first woke up?
A. No, sir.
Q. Did he have anything in his hand when you first saw him?
A. . I didn’t see anything at all, sir. He wouldn’t give me time to put my shoes on.
Q. Well, you woke up and sat up in the corner of the car first, did you?
A. Yes, sir; sat up and looked at him, and asked him if I could put my shoes on.
Q. Was he standing up very close to you?
A. Yes, sir; they came on one behind the other.
Q. You didn’t see anything in the hands of Mr. Fields, or anyone else? Didn’t see them'have anything in their hands?
A. No, sir; I didn’t.
Q. They waited long enough, you say, for you to put on one shoe?
A. Yes, sir.
Q. Then he seized hold of your legs, you say?
A. Yes, sir.
Q. Did he use both hands in taking hold?
A. Yes, sir; I think he did.
Q. Did both of them seize hold of you, or only one?
A. Only one.
Q. What was the other doing?
*276 A. He kept right behind this other fellow all the time.
Q. Kept right behind him?
A. Yes, sir.
Q. Seized hold of yon with both hands?
A. Yes, sir.
Q. Yon didn’t see him have anything in his hand at that time?
A. No, sir; I did not. I thought; it was a knife he had in his hand — something—the blow came so quick.
Q. Did you see him when he seized hold of you, as you say— did he lay anything down on the floor?
A. 'Not that I seen.
Q. You didn’t see him lay anything down or pick anything up?
A. I didn’t see him lay anything down on the car after he woke me up.
Q. You didn’t see anything at all in his hands?
A. I didn’t see anything; no, sir."
Q. After you say he dragged you towards the door by the feet, he then let go of you, did he?
A. Yes, sir.
Q. And you raised up, or got pretty near up on your feet?
A. I was getting upon my knees, like; when I got pretty near straightened up in front of him, I got the blow — the blow came so quick.
Q. Did you see the motion of the arm or anything coming towards you?
A. I could not tell; I thought the hand was drawn back that w&y.
Q. You thought it; did you see it?
A. I didn’t see it distinctly; I hadn’t been hardly wakened up at the time.
*277 Q. The shove was from the same man you must have got the blow from?
A. Yes, sir.
Q. Did you see him put his hauds on to you to push you out, ■ or did you simply feel him ?
A. I saw him raise the left hand like this to give me a shove.
Q. Did you see his right hand at that time?
A. No, sir. ,
Q. You didn’t see any instrument in his hand, then, at anytime, and didn’t know what it was that hit you in the eye?
A. No, sir; 1 didn’t know what it was. I got the blow. I thought at first it was a knife — something of that kind — that I got stabbed. The blow came so quick I couldn’t tell what it was.
Q. You were pretty well intoxicated at that time so as to be somewhat stupid?
A. Well, sir, I had been drinking a little before I went in there.
Q. Had you got thoroughly waked up so that you realized where you was?
A. No, sir; I hadn’t.
Q. You didn’t realize where you were?
A. No, sir; I didn’t know whether it was in a hotel or out in the street when I was wakened up by them.
x- x- x x* x-
Q. You say after you was thrown out of the car you fell on your back?
A. Yes, sir.
Q. How soon was it before you aroused up to consciousness enough to realize where you were?
A. Well, it was about five or ten minutes, I suppose.
Q. Now, you say these men jumped out the other side of the car and ran away?
A. Yes, sir.
*278 Q. How is it you knew that fact when you were in that stupid sort of condition, and your eye hurt so that you couldn’t see out of that eye?
A. I know they didn’t jump out on that side; as soon as I realized myself I could see.
* * * •*
Q. They both ran, did they?
A- Yes, sir. I don’t know whether they ran or walked, or what; I know they got out on the other side of the car.
Q. Do you mean to state positively and distinctly you i aw them run away after they got out of the car?
A. No, sir; I wouldn’t swear to anything of the kind.
Q. Did you see them go away at all?
A. I saw them go out the other side of the car.
Q. That is all you saw of them?
A. That’s all.
Q. Don’t know where they went; whether they walked or ran after they got out?
A. No, sir; I wouldn’t swear where they went to.
* * * *
Q. Do you know which one of the two men it was — whether it was this Mr. Fields or the other man that hit you in the eye?
A. I couldn’t swear positively to it; I-couldn’t swear positively to either of them.
Q. Do you know which one it was that shoved you out of the car?
A. It was the man with light whiskers.
Q. Mr. Fields ?
A. Yes, sir.
Q. You don’t know which one it was that hit you in the eye?
A. No, sir. I judge it was the one who stood in front of me.
Richard Fields, for the defendant, testified as follows: I had two *279 men working on the next car to this same box ear, on the same track; was going along the track; these two men looked into the car; Mr. Yan Horn says, “ There’s a man sleeping here;” I came down immediately and attempted to go in there; this little bar we use for a tool in repairing cars right along was standing outside of the car — it was about ten feet north of the door — and I never placed any confidence in any of the men who was around there, because they used to be around there ten and twelve at a time; I picked this bar up so that, seeing their actions before that, I didn’t know but what he would pick that bar up and strike me with it; I picked up the bar and jumped into the car; this man was laying asleep in there — some man was; I suppose it was this man; I ■waked him up; he looked up at me and laid down again; then I shook him up a little livelier; after that he got right up; he looked right at me, and then he looked right at my feet; I saw at once what he intended to do; I had the bar — about two feet and ten inches long; I had my right hand in the center of it; I stepped back far enough so that he missed me, and his head came right against the bar; at that time Mr. Yan Horn — he wasn’t in at the time — came in and pushed him right out of the car. * * *. He made motions as if he was going to catch me by the feet to tip me over, and he made an attempt to do so. * * *. I stepped back far enough so that he missed me, and hit his eye against that bar.
Q. You had that bar in which hand?
A. Left hand. * * « I had hold about the center of it;
diamond-pointed bar at one end, chisel-point at the other.
Q. At the time he sprang forward and shoved his head against the bar, as you say, did he say anything?
A. He said, “ Oh, my eye!”
Q. Did you know, then, that he was hurt — seriously injured— or anything about it?
*280 A. Mr. Van Horn jumped in the car just about the time he saw him pitch for me, and ketched him and throwed him out doors; I knowed the bar hit him somewhere; 1 didn’t know where; I heard his exclamation. * * *.
Q. Did you strike hfm with the bar?
A. No, sir.
Q. Did you raise it at all to strike him?
A. No, sir.
Q. Did you strike him with your hand, or strike him at all?
A. I did not strike him at all; made no attempt to.
Q. "What was his condition as to being intoxicated, so far as you could judge?
A. As far as I could judge he was intoxicated.
Q. Did he appear in a stupid sort of a condition?
A. Well, not a very stupid condition, but he was in a pretty intoxicated condition. * * *.
Q. Did Van Horn strike him?
A. Not as I know of. * *
George Van Horn, a witness on the part of the defendant, agreeing with the defendant substantially to the time they entered the car, then testified as follows: I opened the door on the south side; Mr. Fields got into the door on the south side; he shook this man up.
Q. Did you get into the car at the same time?
A. No, sir. This man raised up and looked at him, and laid down again; Mr. Fields shook him again, and he got right up on his feet and looked at him, and made a dive for his feet; when he made a dive for Mr. Fields I jumped in the car.
Q. That moment you jumped in the car?
A. Yes, sir. Catched him by the collar and shoved him out of the south side door. * * *. On the north side; we got out on the south side.
*281 Q. Did you see this bar in the hands of Mi’. Fields while he was in the car?
A. Yes, sir.
Q. Did Mr. Fields strike him with the bar, or raise it, or make •any motion towards striking him ?
A. No, sir; I did not see Mr. Fields raise the bar in any shape.
Q. Then did you know he had received an injury at the time you shoved him out?
A. No, sir; I did not. * * *.
Q. Did Mr. Fields strike him with the bar, or punch at him with it?
A. No, sir; I couldn’t say, sir, to that — I didn’t see him move his hand one way or the other.
*****
No claim is made for damages except what resulted from the injury of the plaintiff’s eye. The record is silent as to any other damages.
"We are not unmindful that this court has decided that the verdict of a jury should not be disturbed, nor the findings of a court upon a question of fact, the evidence being conflicting, and will not be unless great injustice seems to have been done, or there is an entire want of evidence to sustain it: Vide, Caulfield et al v. Bogle, 2 Dak., 464; Moline Plow Co. v. Gilbert et al, N. W. Rep., Vol. 15, No. 1, p. 1, (Ante, p. 239.) This also has been the general current of the decisions of the courts in this country, except when the statutes of states have controlled them.
In this case there is not sufficient affirmative evidence to sustain the verdict. The plaintiff could not identify the tool that injured him; he thought it was a knife that the defendant had in his hand; he didn’t see anything at all in his hands; he didn’t see him raise his hands; he didn’t know whether it was his arm, or *282 wliat it was; couldn’t distinctly see; didn’t see any motion; something struck him in the eye.
Without taking time to criticise the condition the plaintiff admits he was in, giving him full scope of all his physical and intellectual powers, and full credit for trnthfullness, it cannot be ascertained from what his testimony discloses, that the defendant or any other person present,, when the injury happened, inflicted it; nor from it does it appear what instrument came in contact with his eye. And if it were not for the testimony of the defendant that “ he (the plaintiff) “ made a motion as if he was going to catch me by the feet to tip me over, and he made an attempt to* do so,” * * * and “ I stepped back far enough so that he missed me and hit his eye against that bar,” it would yet be a matter of conjecture just how the accident occurred. The defendant further testified, that he did not strike him with the bar, nor his hand; and made no attempt to do so. In relation to all which he was corroborated by Mr. Yan Horn, and not contradicted by the plaintiff.
The modern rule of the Supreme Court of the United States in relation to the power of the Court to direct the verdict, is thus: When the Judge is clear of doubt that a verdict ought to be rendered either for the plaintiff or the defendant, and that it would be his duty to set a contrary one aside, he ought to instruct the jury so to find. On the other hand such a direction cannot properly be given to the jury, unless the evidence is such as to leave no room for doubt that it is the duty of the jury to find accordingly: Orleans v. Platt, 99 U. S., 677; Pence v. Langdon, id. 578; Commissioners v. Clark, 94, id. 278, 284; Hendrick v. Lindsay, 93, id. 143.
Again, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient *283 to support or justify a verdict in bis favor. Not, whether on all the evidence the preponderating weight is in his favor — that is the business of the jury; but, conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it -does not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial: Pleasants v. Faut, 22 Wall., 116, 121, 122.
There being a want of evidence to support the verdict, and no -conflict thereof so far as it relates to the grievance complained of, the judgment -of the court below is reversed, and a new trial
Ordered.
All the Justices concurring.